# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

SFX REACT-OPERATING LLC,

        Plaintiff,        CASE NO. 16-13311
                                HON. DENISE PAGE HOOD

v.

EAGLE THEATER ENTERTAINMENT,
LLC,
BLAIR MCGOWAN,
AMIR DAIZA,
MATTHEW FARRIS

        Defendants.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS [#25]

## I.      BACKGROUND

### A. 16-13288 (Related Case), Procedural Background

On September 12, 2016, Plaintiff React Presents, Inc. ("React") filed a Complaint against Defendants Eagle Theater Entertainment, LLC ("Eagle"), Blair McGowan ("McGowan"), Amir Daiza ("Daiza"), and Matthew Farris ("Farris") (collectively, "Defendants") alleging breach of contract (Count I), fraud (Count II), breach of fiduciary duty (Count III), violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Count IV), and unjust enrichment (Count V). (Doc # 1) Defendants filed an Amended Motion for Judgment on the

1

Pleadings on May 17, 2017.  (Doc # 22)  React filed a Response on June 7, 2017. (Doc # 24)  Defendants filed a Reply on June 26, 2017.  (Doc # 25)

## B. 16-13311, Procedural Background

On September 13, 2016, Plaintiff SFX-React Operating LLC ("SFX") filed a Complaint against Defendants Eagle Theater Entertainment, LLC ("Eagle"), Blair McGowan ("McGowan"), Amir Daiza ("Daiza"), and Matthew Farris ("Farris") (collectively, "Defendants") alleging breach of contract (Count I), fraud (Count II), breach of fiduciary duty (Count III), violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Count IV), and unjust enrichment (Count V).  (Doc # 1)  This matter is presently before the Court on Defendants' Motion for Judgment on the Pleadings, filed on May 17, 2017.  (Doc # 25)  SFX filed a Response on June 7, 2017.  (Doc # 27)  Defendants filed a Reply on June 26, 2017. (Doc # 28)

## C. Factual Background

Plaintiff React was a club, concert, and festival promotion company in the Midwest with its base of operations in Illinois.  In 2014, Plaintiff SFX acquired at least some of React's assets.  SFX is also in the business of promoting clubs, concerts, and festivals in the Midwest with its base of operations in Illinois. Defendants own and operate several concert venues in the Metro Detroit area including Elektricity, a nightclub in Pontiac, Michigan.  Elektricity serves as a

concert venue allegedly exclusively for electronic musicians, DJs, and other artists who perform electronic dance music ("EDM"). Defendant McGowan owns Defendant Eagle and is its managing member. Defendant Daiza is responsible for overseeing Eagle's operations and overseeing the bookkeeping. Defendant Farris is Eagle's bookkeeper.

In late 2012, React and Defendants began putting on EDM concerts together at Eagle. At first, React and Eagle allegedly orally agreed to split the profits (or losses) 50-50. React was responsible for negotiating and contracting with artists, advertising, marketing, and promoting the concerts. Eagle was responsible for operating the venue and selling tickets at the box office. In November 2013, the parties memorialized their agreement and practices in a written co-promotion agreement. According to React, React and Eagle co-promoted approximately 100 concerts from 2012 until React's assets were acquired by SFX in April 2014 under the terms of the co-promotion agreement. After each concert, Eagle would provide React with a "settlement" document via e-mail purporting to indicate the profits generated. The settlements were allegedly prepared by Defendant Farris, overseen and approved by Defendant Daiza, and approved by Defendant McGowan. React would review the settlements, and Eagle would send a check to React via the United States mail for React's share of the profits.

In April 2014, SFX and Eagle began co-promoting concerts under the same terms as the prior agreement between React and Eagle. According to SFX, the transition was seamless because SFX was operated by the principals of React. On or around May 1, 2014, SFX and Eagle entered into a written co-promotion agreement, the material terms of which were identical to the agreement between React and Eagle. SFX and Eagle have co-promoted at least 83 EDM concerts from April 2014 through 2016. After each concert, Eagle provides SFX with a settlement document via e-mail purporting to indicate the profits generated. The settlements have been allegedly prepared by Defendant Farris, overseen and approved by Defendant Daiza, and approved by Defendant McGowan. SFX reviews the settlements, and Eagle then sends a check to SFX via the United States mail for SFX's share of the profits.

According to Plaintiffs, in January 2016, a disgruntled Eagle employee provided React and SFX with what Plaintiffs allege to be true and accurate accounting records disclosing that Eagle kept two sets of books showing receipts from the concerts. Plaintiffs allege that Eagle's settlements systematically and fraudulently underreported the true profits from almost every single one of the co-promoted concerts.

According to React, it was paid approximately $82,400.00 less than what it should have received under the co-promotion agreement. React further alleges that

Defendants' scheme resulted in a $400,000.00 reduction in React's "Earn-Out Payment" (a multiplier on profits) under an Asset Membership Interest and Contribution Agreement between SFX Entertainment, Inc. and SFX-React Operating, LLC (the terms of which Defendants were allegedly aware) when SFX acquired React assets in 2014.

According to SFX, it was paid approximately $126,200.00 less than what it should have received under the terms of the co-promotion agreement. SFX further alleges that Eagle has withheld payments totaling approximately $200,000.00 for at least 16 concerts that SFX and Defendants have co-promoted since March 2016.

In September 2016, React and SFX brought actions against Defendants alleging that they suffered hundreds of thousands of dollars in damages because, as a result of Defendants systematic and fraudulent underreporting, React and SFX almost always received less from the concerts than the 50 percent of the profits to which they were entitled under the co-promotion agreements.[1]

Defendants now move for judgment on the pleadings and ask this Court to dismiss React's Complaint and SFX's Complaint in their entirety. Defendants argue that the breach of contract claims and unjust enrichment claims fail because

---

[1] In February 2017, Defendants counterclaimed that React and SFX used the control they gained over EDM artists via radius clauses in performance contracts as monopolistic leverage to enter the Metro Detroit EDM market, and that React was unjustly enriched when it received hundreds of thousands of dollars from alcohol sales at the co-promoted concerts. React and SFX each moved to dismiss Defendants' Counterclaims. On May 3, 2017, the Court held a hearing on Plaintiffs' motions.

the subject matter of the co-promotion agreements is illegal, rendering them unenforceable. Defendants further argue that because the co-promotion agreements are void, React and SFX had no property rights of which they could be defrauded, and their RICO claims fail. Defendants also argue that the fraud claims fail because, under Michigan law, they cannot survive on the basis of performance of contracts. Lastly, Defendants argue that the breach of fiduciary duty claims fail because there was no fiduciary relationship between the parties.

## II. ANALYSIS

### A. Standard of Review

Federal Rule of Civil Procedure 12(c) authorizes parties to move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). Motions for judgement on the pleadings are analyzed under the same standard as motions to dismiss under Rule 12(b)(6). *See Warrior Sports, Inc. v. Nat'l Collegiate Athletic Ass'n*, 623 F.3d 281, 284 (6th Cir. 2010). "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Id.*

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court explained that "a plaintiff's obligation to provide the 'grounds' of his

'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.* at 555. A plaintiff's factual allegations, while "assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (emphasis in original) (citing *Twombly*, 550 U.S. at 555). "To state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *Bredesen*, 500 F.3d at 527 (citing *Twombly*, 550 U.S. at 562).

When deciding a 12(c) motion for judgment on the pleadings, as a general rule, matters outside the pleadings may not be considered unless the motion is converted to one for summary judgment under Fed. R. Civ. P. 56. *See Weiner v. Klais & Co.*, 108 F.3d 86, 88 (6th Cir. 1997). The Court may, however, consider "the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Id.* at 89.

## B. Breach of Contract Claims

Defendants argue that Plaintiffs' breach of contract claims fail because Plaintiffs are seeking damages for bar sales. Defendants argue that the sharing alcohol proceeds with a non-licensed person is illegal and any contract to do so is void. Defendants also argue that the co-promotion agreements are unenforceable because they violate public policy set forth in the administrative rules promulgated by the Michigan Liquor Control Commission.

Plaintiffs respond that the co-promotion agreements are facially valid because their plain language does not violate Michigan's Liquor Control Code. Plaintiffs also argue that the co-promotion agreements are not void *ab initio*, and even if they were, the Court should sever any illegal portion to save the remainder. Plaintiffs further argue that the co-promotion agreements do not violate public policy because they provide that the parties were to share revenues from a host of revenue sources including ticket sales, merchandise commissions, and sponsorship revenue.

In this case, Eagle holds a liquor license from the Michigan Liquor Control Commission, and the record shows that Defendant McGowan is the only person affiliated with this license. (Doc # 25-1) React and SFX are not mentioned. The Michigan Liquor Control Commission rules provide that "a licensee shall not allow a person whose name does not appear on the license to use or benefit from the

license." Mich. Admin. Code R. 436.1041(1). The Michigan Liquor Control Code, in turn, provides that "a person, other than a person required to be licensed under this act, who violates this act is guilty of a misdemeanor." Mich. Comp. Laws § 436.1909(1). It further provides that "a licensee who violates this act, or a rule or regulation promulgated under this act, is guilty of a misdemeanor punishable by imprisonment for not more than 6 months or a fine of not more than $500.00, or both." *Id.* at § 436.1909(2).

Under the express terms of the co-promotion agreements at issue, the parties were to split net profits or net losses from all "adjusted gross receipts" less all "approved show costs." "Adjusted gross receipts" was defined to include proceeds from the sales of admissions to the events, ticket service charges, net travel package income, refunds, rebates, merchandise commissions, concessions commissions, sponsorship revenue, and insurance recoveries. The term "concessions commissions" was not defined. The co-promotion agreements also included the following provisions:

> 14.5    Severability.   If any provision of this Agreement or the application thereof is held invalid, the invalidity shall not affect the other provisions of this Agreement provided that the material terms of this Agreement can be given their intended effect without the invalid provisions, and to this extent the provisions of this Agreement are declared to be severable.
>
> . . .

14.8  <u>Representations and Warranties; Covenants</u>.  Each Party hereby represents, warrants and agrees that . . . (b) it shall perform its activities under this Agreement in accordance with all applicable Federal, state and local laws and regulations . . . .

In Michigan, the paramount goal when interpreting a contract is to give effect to the intent of the contracting parties.  *Old Kent Bank v. Sobczak*, 243 Mich. App. 57, 63-64 (2000).  The court is to read the agreement as a whole and attempt to apply the plain language of the contract itself.  *Id.*  If the intent is clear from the language of the contract itself, there is no place for further construction or interpretation of the agreement.  *Farm Bureau Mut. Ins. Co. v. Nikkel*, 460 Mich. 558, 566 (1999).  A contract provision that is clear and unambiguous must be "taken and understood in [its] plain, ordinary, and popular sense."  *Mich. Mut. Ins. Co. v. Dowell*, 204 Mich. App. 81, 87 (1994).

Where contract language is neither ambiguous nor contrary to a statute, the will of the parties, as reflected in their agreement, is to be carried out, and the contract is enforced as written.  *See Cruz v. State Farm Mut. Auto. Ins. Co.*, 466 Mich. 588, 594 (2002).  Because contracting parties are assumed to want their contract to be valid and enforceable, courts in Michigan construe contracts that are potentially in conflict with a statute and against public policy, where reasonably possible, to harmonize them with the statute.  *Id.* at 599.

The Court finds that the co-promotion agreements are valid and enforceable.  First,  the  plain  language  of  the  agreements  does  not  include  mention  alcohol

proceeds and cannot be said to violate Michigan's Liquor Control Code or the public policy reflected therein. Indeed, the co-promotion agreements expressly exclude Defendants' sharing of alcohol proceeds with Plaintiffs because Plaintiffs' names do not appear on Eagle's liquor license to use or benefit from the liquor license as required by Michigan laws and regulations, and all parties expressly agreed to perform under the co-promotion agreements in accordance with Michigan laws and regulations.

Second, even if the Court were to find an ambiguity regarding the sharing of alcohol proceeds, the Court would construe the co-promotion agreements in a manner that renders them compatible with the existing public policy as reflected in the administrative rules promulgated by the Michigan Liquor Control Commission, so as to give effect to the intent of the parties that their co-promotion agreements be enforced as written. And should there be questions of fact regarding the meaning of any ambiguous language, judgment on the pleadings would be inappropriate. *See Galeana Telecomm. Invs., Inc. v. Amerifone Corp.*, 202 F. Supp. 3d 711, 720 (E.D. Mich. 2016).

Third, even if the Court were to find a provision for illegal sharing of alcohol revenue that could potentially render the co-promotion agreements void, the Court could sever any such provision. As described above, under the express terms of the co-promotion agreements, the parties were to split net profits from

several revenue sources that were unrelated to the sale of alcohol and do not violate public policy, and the co-promotion agreements contained severability provisions. *See Tata Consultancy Servs., a Div. of Tata Sons Ltd. v. Sys. Int'l, Inc.*, 31 F.3d 416, 428 (6th Cir. 1994) (noting that to invalidate a contract in its entirety based on a single provision, in that case the liquidated damages provision, would be to render the severability clauses meaningless).

Lastly, Defendants in this case rely on *Krause v. Boraks*, 341 Mich. 149 (1954), and *Turner v. Schmidt Brewing Co.*, 278 Mich. 464 (1936), in support of their argument that the co-promotion agreements are void—that is that they never came into existence and were a nullity from the outset, so they could not confer rights or obligations on the parties. Plaintiffs argue that if the Court does not find that the co-promotion agreements are valid, then they are at least not void *ab initio*, but rather, voidable at the option of the parties. The Court need not reach this argument because, as discussed above, the Court finds that the co-promotion agreements are facially valid. However, the Court notes that the Michigan Supreme Court recently explained, citing both *Krause* and *Turner*, that courts in Michigan "have been known to be imprecise with their use of the term 'void,' and have on occasion mistakenly employed that term to describe a contract when what is actually meant is that a contract is voidable or otherwise enforceable, and not

that it is void *ab initio*." *Epps v. 4 Quarters Restoration LLC*, 498 Mich. 518, 537 (2015).

The Court denies Defendants' Motions for Judgment on the Pleadings as to the breach of contract claims.

## C. Unjust Enrichment Claims

Defendants argue that Plaintiffs' unjust enrichment claims fail because there was an express contract to promote the concerts. Defendants also argue that even if an express contract did not address the subject matter under dispute, an illegal and void contract cannot be enforced through equity. Defendants further argue that Eagle was not unjustly enriched because it was the only person who had any right to proceeds from a Michigan liquor license.

Plaintiffs respond that the Complaints expressly plead that the unjust enrichment claims are brought in the alternative to the breach of contract claims, and if the co-promotion agreements are found unenforceable, Plaintiffs should be permitted to proceed on their unjust enrichment claims. Plaintiffs also argue that even if the co-promotion agreements were deemed unenforceable, Plaintiffs can still recover through equity from Defendants, the greater wrongdoers. Plaintiffs further argue that the Complaints sufficiently plead the elements of unjust enrichment.

To establish a claim for unjust enrichment in Michigan, a plaintiff must show:  (1) receipt of a benefit by the defendant from the plaintiff, and (2) an inequity resulting to the plaintiff because of the defendant's retention of the benefit.  *Belle Isle Grill Corp. v. Detroit*, 256 Mich. App. 463, 478 (2003).  "If both elements are established, Michigan courts will then imply a contract to prevent unjust enrichment.  However, a contract will not be implied where an express contract governing the same subject matter exists."  *Joseph v. JPMorgan Chase Bank, Nat'l Ass'n*, No. 12-12777, 2013 WL 228010 (E.D. Mich. Jan. 22, 2013).  "Where a contract governs the relationship of the parties, a cause of action for unjust enrichment will not be recognized."  *E3A v. Bank of America, N.A.*, No. 13-10277, 2013 WL 1499560, at *4 (E.D. Mich. Apr. 11, 2013).

The relationship between Defendants and Plaintiffs was governed by express contracts, the co-promotion agreements.  Under the agreements' express terms, the parties were to split net profits or net losses from all "adjusted gross receipts" less all "approved show costs" for all co-promoted concerts.  The Complaints themselves allege that the parties co-promoted dozens of concerts under the terms of the co-promotion agreements, and the Plaintiffs attached the written express contracts to the Complaints.   The basis of this dispute, the splitting of net profits from the co-promoted concerts is the subject matter governed by the express co-promotion agreements between the parties.   The co-promotion agreements

expressly provide which proceeds the parties were to split and how. The Court declines to imply another contract between the parties under an unjust enrichment theory.

The Court grants Defendants' Motions for Judgment on the Pleadings as to the unjust enrichment claims.

### D. Fraud Claims

Mentioning the economic loss doctrine, Defendants argue that Plaintiffs' fraud claims fail because they are predicated on contractual duties. Defendants argue that Plaintiffs have not identified a duty that is separate and distinct from any duty owed under the co-promotion agreements.

Plaintiffs respond that the economic loss doctrine does not bar their fraud claims because this doctrine only applies to transactions involving the sale of goods. Plaintiffs also argue that duty is not an element of their fraud claim. Plaintiffs further argue that Defendants' knowing, false representations go above and beyond mere failure to perform under the co-promotion agreements. Plaintiffs assert that, at the very least, the fraud claims must survive as to individual Defendants McGowan, Daiza, and Farris because they are not parties to the co-promotion agreements (only Defendant Eagle is) and did not owe Plaintiffs any contractual duty.

Plaintiffs' breach of contract claims allege that Defendant Eagle breached the co-promotion agreements by failing to perform, that is, by failing to split the profits equally. Plaintiffs' fraud claims allege that Defendants Eagle, McGowan, Daiza, and Farris willfully and intentionally created false settlement documents that underreported Eagle's profits.

### 1. Economic Loss Doctrine

"Where a claim for damages arises out of the commercial sale of goods, and the losses incurred are purely economic, the 'economic loss doctrine' bars tort recovery and limits the plaintiff's remedies to those available under the Uniform Commercial Code." *Cargill, Inc. v. Boag Cold Storage Warehouse, Inc.*, 71 F.3d 545, 550 (6th Cir. 1995) (citing *Neibarger v. Universal Coop., Inc.*, 439 Mich. 512, 515 (1992)). Michigan courts apply the economic loss doctrine only in situations involving the sale of goods, not in situations involving transactions in services. *Cargill*, 71 F.3d at 550.

Because the co-promotion agreements at issue do not involve the sale of goods, the economic loss doctrine does not bar Plaintiffs' fraud claims. Defendants' reliance on *Fultz v. Union-Commerce Assocs.*, 470 Mich. 460 (2004), is misplaced because *Fultz* did not involve a fraud claim and the court in *Fultz* did not discuss or apply the economic loss doctrine. To the extent that Defendants rely on *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*, 209 Mich. App.

365 (1995), that case involved a contract for the sale of goods, unlike the co-promotion agreements at issue here. The court in *Huron* found that fraud in the inducement was an exception to the economic loss doctrine, but that the plaintiff had failed to plead such a fraud and was therefore restricted to contractual remedies available under the UCC. *Id.* at 368; *see Dell'Orco v. Brandt*, No. 03-71929, 2005 WL 1355088, at *5 (E.D. Mich. May 3, 2005) (discussing *Huron* and finding that the economic loss doctrine has not been extended beyond disputes between purchasers and sellers).

## 2. Separate and Distinct Duty

In general, a tort action for the nonperformance of a contract cannot be maintained in Michigan. *DBI Invs., LLC v. Blavin*, 617 F. App'x 374, 381 (6th Cir. 2015) (quoting *Ferrett v. Gen. Motors Corp.*, 438 Mich. 235 (1991)). Where there is a contract between the parties, an action in tort generally requires a breach of duty separate and distinct from a breach of contract. *Galeana*, 202 F. Supp. 3d at 723.

> This "separate and distinct duty" analysis has its roots in *Hart v. Ludwig*, 347 Mich. 559 (1956), a case involving a negligence claim against the defendant for the nonperformance of an oral agreement to care for and maintain the plaintiffs' apple orchard. The Michigan Supreme Court held that the plaintiffs could not maintain their negligence action because the tort required "some active negligence or misfeasance," as opposed to the defendant's nonfeasance. According to the court, there must be some breach of duty distinct from breach of contract. . . .

The *Hart* principle makes sense in the context of a tort claim, like negligence, which is premised on the breach of a legal duty. However, a claim for fraudulent misrepresentations differs in that there is no duty as one of its elements. Under Michigan law, a plaintiff asserting a claim of common-law fraud must prove the following elements:

> (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage.

*Bennett v. MIS Corp.*, 607 F.3d 1076, 1100–1101 (6th Cir.2010) (quoting *Cummins v. Robinson Twp.*, 283 Mich. App. 677, 770 (2009) (per curiam)). Unlike the elements of a negligence claim, the elements of a classic fraud claim do not include a legal duty owed or breach of any duty. As such, the *Hart* principle does not apply . . . .

*Galeana*, 202 F. Supp. 3d at 723 (some internal quotations and citations omitted).

The Court applies the same reasoning to this case. Duty is not an element of the Plaintiffs' fraud claims, so the *Hart* principle does not apply here. Defendants rely on *Fultz*, but *Fultz* is distinguishable from this case because the plaintiff in *Fultz* brought a negligence claim, not a fraud claim. *Fultz*, 470 Mich. at 462. The court therefore correctly applied the *Hart* principle and concluded that the plaintiff failed to establish that the defendant owed her a duty (a required element of her negligence claim) that was separate and distinct from the defendant's contractual duty.

The Court concludes that Defendants' arguments fail and denies Defendants' Motions for Judgment on the Pleadings as to the fraud claims.

## E. Breach of Fiduciary Duty Claims

Defendants argue that Plaintiffs' breach of fiduciary duty claims fail because the co-promotion agreements expressly state that the agreements shall not be construed as creating joint ventures. Defendants assert that nothing in the parties' relationships has traditionally been recognized as involving fiduciary duties; rather, the parties are competitors in the music business.

Plaintiffs respond that the Complaints sufficiently allege all the elements of a joint venture. Plaintiffs argue that the language in the co-promotion agreements is not dispositive as to the parties' legal relationships, but rather just one factor to be considered. Plaintiffs argue that the facts alleged in the Complaints and the language in the co-promotion agreements raise a question of fact regarding whether the parties were, despite any statements about themselves, engaged in joint ventures. Plaintiffs further note that they have not alleged that they are competitors of Defendants, and that, in any event, competitors can and do form joint ventures.

A joint venture is an association to carry out a single business enterprise for a profit, and whether or not a joint venture exists is a legal question for the trial court to decide. *Berger v. Mead*, 127 Mich. App. 209, 214 (1983). The key

consideration is whether the parties intended a joint venture. *Id.* at 215. This intention is to be determined in accordance with the ordinary rules governing the interpretation and construction of contracts. *Kay Inv. Co. v. Brody Realty No. 1, L.L.C.*, 273 Mich. App. 432, 439 (2006) (internal quotations and citation omitted). The elements of a joint venture are: (1) an agreement indicating an intention to undertake a joint venture; (2) a joint undertaking of; (3) a single project for profit; (4) a sharing of profits as well as losses; (5) contribution of skills or property by the parties; and (6) a joint proprietary interest and a right of mutual control over the subject matter of the enterprise. *Meyers v. Robb*, 82 Mich. App. 549, 557 (1978); *In re Valley-Vulcan Mold Co.*, 5 F. App'x 396, 400 (6th Cir. 2001). The stipulated share of net profits does not in itself create a joint venture. *Gleichman v. Famous Players-Lasky Corp.*, 241 Mich. 266, 275 (1928). "When two persons are engaged in the prosecution of a joint enterprise, each has authority to act for both in respect to the means or agencies employed to execute the common purpose and the negligence of one in the management thereof will be imputed to both." *Id.* (internal quotations and citation omitted).

In *Gleichman*, the plaintiff ran a movie theatre, and the defendant produced and distributed films. The parties entered into a contract providing for the exclusive exhibit of the defendant's films at the plaintiff's theatre for a term of five years under the terms of a "booking contract" to be entered into each year. *Id.* at

268.   The court found that the parties were not joint venturers, explaining as follows.

> Under the contracts defendant had no voice in the manner in which the business should be conducted by plaintiff except its insistence that the advertising it prepared should be used and a minimum admission fee be charged, and these solely for the purpose of increasing its license or rental charge. It incurred no liability to any person other than the plaintiff. The parties had no joint investment in property. The contracts fixed their rights and liabilities in every respect. On a breach by either, the other might declare the contract at an end and have an action for damages sustained thereby. The time within which plaintiff might bring such action was fixed in the contract. Except as fixed and determined by the contract itself, neither party had or was to exercise any proprietary interest or control over that which the other had and exclusively controlled. There was no common property interest in what either party contributed to the business. . . .
>
> Under the provisions of these contracts, both the plaintiff and the defendant incurred certain obligations personal to each. There was no joint obligation. There was no service to be rendered by them jointly. There could be no indebtedness incurred for which they were jointly liable. There was no sharing of losses. While they were both interested in the success of the venture, such success, even if both of the parties fully performed, was dependent upon the patronage of the public, over which, except by the class of pictures exhibited, the advertising, and the conduct of the theater by plaintiff, they had no control. Suppose plaintiff had refused to accept the films from defendant and exhibit them as agreed. Would it be contended that defendant might then have taken possession of the theater and exhibited them itself? Clearly, its only relief would have been an action for damages for breach. . . . In our opinion, the contracts did not constitute the parties joint adventures.

*Id.* at 276–78.

In this case, Plaintiffs correctly note that competitors can and do form joint ventures.  *See Beverage Distribs., Inc. v. Miller Brewing Co.*, 690 F.3d 788, 790

(6th Cir. 2012). However, aside from a formulaic recitation of the elements of a joint venture, the Complaints lack factual allegations supporting Plaintiffs' position that the parties intended to form joint ventures. Even assuming, without deciding, that the Plaintiffs have sufficiently pled the second, third, fourth, and fifth elements of a joint venture, Plaintiffs have not shown that they could meet the first or sixth element. As to the first element of a joint venture, there is no agreement indicating any intention to undertake joint ventures. Indeed, the plain language in the co-promotion agreements expressly indicates the opposite intent:

> INDEPENDENT CONTRACTOR. The relationship created by this Agreement is that of independent contractors, and nothing contained in this agreement shall be deemed or construed as creating any partnership, joint venture, employment relationship, agency or other relationship between the parties, nor does it grant either Party any authority to assume or create any obligation on behalf of or in the name of the other, except as expressly provided herein.

(Doc # 1-1)

As to the sixth element of a joint venture, the Complaints fail to allege joint proprietary interests or rights of mutual control over the subject matter of the enterprises. The co-promotion agreements fixed the parties' rights and liabilities in every respect, and there was no common property interest in what each party contributed to the concert co-promotions. Under the co-promotion agreements, there was no joint obligation or service to be rendered by the parties jointly.

Additionally, there is no allegation of a joint venture name, joint venture accounts, joint venture property, or comingling of funds or property between the parties. *See Gleichman*, 241 Mich. at 272. There is no allegation that any one party acted as agent for any other, or that any one party was able to direct the conduct of any other; there is no allegation of common responsibility among the parties for negligent conduct on the part of any one party. *See Berger*, 127 Mich. App. at 216-17.

While language in a contract may not always be dispositive as to the legal relationship between the parties,[2] it is an important factor in determining the parties' intent—the paramount consideration as to whether any joint venture exists. The Court concludes that Plaintiffs in this case have not shown entitlement to relief because they have failed to allege sufficient facts constituting indicia of joint ventures between the parties. Plaintiffs' breach of fiduciary duty claims fail, and the Court grants Defendants' Motions for Judgment on the Pleadings as to the breach of fiduciary duty claims.

---

[2] The Court notes that Plaintiffs cite only employment cases (all of which involved other statutes not at play in this contract case) in support of their argument that the independent contractor language in the co-promotion agreements is relevant but not dispositive. *See Weary v. Cochran*, 377 F.3d 522, 524-28 (6th Cir. 2004) (analyzing whether the plaintiff was an employee or independent contractor in a civil rights, age discrimination case); *Wolcott v. Nationwide Mut. Ins. Co.*, 884 F.2d 245, 249-51 (6th Cir. 1989) (analyzing whether the plaintiff was an employee within the meaning of ERISA); *City of Detroit v. Salaried Physicians Prof'l Ass'n, UAW*, 165 Mich. App. 142, 146-49 (1987) (upholding Michigan Employment Relations Commission's finding that the appellees physicians were employees and not independent contractors for purposes of union certification election); *Cimorelli v. N.Y. Cent. R. Co.*, 148 F.2d 575, 577-80 (6th Cir. 1945) (analyzing whether the plaintiff was an employee within the meaning of the Federal Employers' Liability Act).

The Court further notes that the co-promotion agreements contain the following merger clause: "This Agreement contains the entire agreement between the parties and merges any prior representations, warranties, or understandings they may have had regarding the subject matter of this Agreement. This Agreement may not be modified, altered or amended, except by a written instrument signed by both parties." (Doc # 1-1) The Court finds that this provision unambiguously expresses the parties' intent to fully integrate their agreements, which could have but did not formalize the parties' relationships as joint ventures. *See John Harris & Assocs., Inc. v. Day*, 916 F. Supp. 651, 656–57 (E.D. Mich. 1996). Plaintiffs may not, as a matter of law, introduce evidence which seeks to vary or contradict the express and unambiguous provisions of the co-promotion agreements, including evidence of conduct indicating that the parties were engaged in a joint venture. *Id.* at 657.

## F. RICO Claims

Defendants argue that Plaintiffs' RICO claims fail because these are garden-variety business disputes, which RICO has not federalized. Next, Defendants again argue that Plaintiffs had no property rights to share in "bar sales," so Plaintiffs were not deprived or defrauded out of anything under the "void" co-promotion agreements. As to this second argument, Defendants merely rely on

their previous arguments that the Court has already discussed and rejected above, so the Court will not address them again.

Plaintiffs respond that Defendants' alleged conduct is the type of long-term criminal activity that gives rise to a claim under RICO. Plaintiffs further argue that they were defrauded, that the Complaints adequately allege that Defendants made false statements to Plaintiffs, and that Plaintiffs had a property interest under the co-promotion agreements in revenue from sales of admissions to the events, ticket service charges, net travel package income, refunds, rebates, merchandise commissions, concessions commissions, sponsorship revenue, and insurance recoveries.

Defendants cite a single Seventh Circuit case in support of their one remaining argument that these are garden-variety business disputes, which RICO has not federalized. *See Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1025 (7th Cir. 1992). However, Defendants do not present any clear argument or identify which element of the RICO claims has not been properly alleged based on the cited case. In *Midwest Grinding*, the court affirmed dismissal of RICO counts because the plaintiff had not met the continuity prong showing a threat of continued criminal activity. *Id.* at 1023-25. However, Defendants in this case fail to argue or explain how Plaintiffs may have failed to meet the continuity prong (or any other

prong). The Court denies Defendants' Motions for Judgment on the Pleadings as to the RICO claims.

## III. CONCLUSION

For the reasons set forth above,

IT IS HEREBY ORDERED that Defendants' Motion for Judgment on the Pleadings (Doc # 25) is GRANTED IN PART as to the unjust enrichment claim and breach of fiduciary duty claim, and DENIED IN PART as to the breach of contract claim, fraud claim, and RICO claim.


Dated: August 23, 2017                    s/Denise Page Hood
                                          Chief, U.S. District Court


I hereby certify that a copy of the foregoing document was served upon counsel of record on August 23, 2017, by electronic and/or ordinary mail.

                                          s/Julie Owens
                                          Acting in the absence of LaShawn Saulsberry
                                          Case Manager